UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

OMEGA SMITH, as Personal
Representative of the Estate of L.T.,
a deceased minor,

        Plaintiff,

v.                                            CASE NO. 3:10-CV-00317-J-32JBT

VICKI BEASLEY *et al.*,

        Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

    **THIS CAUSE** is before the Court on Defendant, Partnership for Strong

Families, Inc.'s ("PFSF") Motion to Dismiss Plaintiff's Amended Complaint (Doc. 27),

Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. 32) (collectively,

"Motions to Dismiss"), Defendant, PFSF's Supplemental Memorandum of Law in

Support of Its Motion to Dismiss Plaintiff's Amended Complaint[2] (Doc. 47), and

Plaintiff's Response to Defendants' Motions to Dismiss (Doc. 43) ("Response").  On

_____

    [1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

    [2] PFSF's Supplemental Memorandum of Law (Doc. 47) was filed pursuant to the Court's December 30, 2010 Order (Doc. 46), which granted PFSF leave to file a supplemental memorandum of law.

November 24, 2010, the Motions to Dismiss were referred to the undersigned for a report and recommendation regarding an appropriate resolution thereof.  (Doc. 44.) For the reasons stated herein, the undersigned respectfully recommends that the Motions to Dismiss be **DENIED**.

## I.    Allegations of Plaintiff's First Amended Complaint

Plaintiff, Omega Smith, as Personal Representative of the Estate of L.T., a deceased minor,[3] filed this action against PFSF, Community Partnership for Children, Inc. ("CPCI"), and the following individuals: Vicki Beasley ("Beasley"), Latoya Anderson ("Anderson"), Andrea Senteio ("Senteio"), and Marianna Cotter ("Cotter").  (Doc. 1.)  Plaintiff's First Amended Complaint ("Complaint")  alleges six counts under 42 U.S.C. § 1983, against Defendants, Beasley (Count I), Anderson (Count II), Senteio (Count III), Cotter (Count IV), PFSF (Count V), and CPCI (Count VI); two wrongful death counts, against Defendants, PFSF (Count VII) and CPCI (Count VIII); and a negligence count against all Defendants for damages unrelated to death (Count IX).  (Doc. 24.)

The action arises out of the death of L.T. on or about April 18, 2008, as a result of an automobile accident.  (*Id.* at ¶ 52.)  At the time of the accident, the minor had run away from the custody of PFSF and/or CPCI.  (*Id.*)  The Complaint alleges that Defendants had not only allowed L.T. to run away, but encouraged and assisted her in doing so.  (*Id.* at ¶¶ 6, 37, 51, 104, 125, 128, 149, 152, 173, 176, 197, 200,

---

[3] At the time of her death, the minor was seventeen years old.  (Doc. 24, ¶¶ 1, 232.)

221, 224.)  It is also alleged that Defendants knew that the child was at a heightened risk of physical harm while on runaway status.  (*Id.* at ¶¶ 35, 103, 127, 151, 175, 199, 223.)   Further, the Complaint alleges that Defendants contributed to that heightened risk not only by encouraging and assisting the child in running away, but also by failing to provide her with proper supportive services prior to the time she ran away on April 4, 2008.  (*Id.* at ¶ 6, 49, 73-77, 83.)

The Complaint alleges that PFSF and CPCI were non-profit, Florida corporations, and Beasley, Anderson, Senteio, and Cotter were employed by PFSF and/or CPCI.  (*Id.* at ¶¶ 2, 8, 14, 21, 28.)   Beasley and Anderson were unit supervisors.  (*Id.* at ¶¶ 8, 28.)  Senteio was a case worker, case manager, and/or family care counselor.  (*Id.* at ¶ 21.)  Cotter was a program director.  (*Id.* at ¶ 14.) The Florida Department of Children and Families ("the Department") contracted with either PFSF and/or CPCI to provide placement and services for the minor.  (*Id.* at ¶ 2.)

The Complaint further alleges that shortly after her birth in 1990, the minor was removed from her parents, placed with other relatives, and adjudicated as a dependent child.  (*Id.* at ¶¶ 58-59.)  At various times between 2004 and 2008, the child began abusing drugs and alcohol, began exhibiting violent and aggressive behavior, and showed indications that she had been physically and sexually abused. (*Id.* at ¶¶ 61-64.)  In 2006, the child was Baker Acted by her family.  (*Id.* at ¶ 65.) She resided in various relative and non-relative placements until January of 2007,

3

when she was placed in foster care.  (*Id.* at ¶ 67.)  On January 25, 2008, the child ran away from school.  (*Id.* at ¶¶ 41, 71.)  On March 13, 2008, she ran away again—this time from the offices of PFSF and/or CPCI—and remained at large for several weeks.  (*Id.* at ¶¶ 42, 73.)

On April 4, 2008, the minor's biological mother, adult siblings, and a family friend located her at the College Arms Apartments in Palatka, Florida, and returned her to the PFSF and/or CPCI offices the same day.  (*Id.* at ¶ 43.)  At that time, the child's relatives and family friend were told by Beasley, Anderson, and/or Senteio, in the child's presence, that there was nothing that these Defendants, PFSF, and/or CPCI could, or would, do to stop the child from running away again.  (*Id.* at ¶¶ 46-47.)  Despite this statement, Defendants resumed custody of the minor.  (*Id.* at ¶ 48.)  A short time thereafter, the child was given her suitcase, clothing, and other personal belongings, or access to same, and allowed to run away from the PFSF and/or CPCI offices.  (*Id.* at ¶¶ 49, 73.)

Two weeks later, on April 18, 2008, while still on runaway status, the child was involved in a serious motor vehicle accident and suffered life threatening injuries.  (*Id.* at ¶ 52.)  She survived the initial crash and could be heard screaming for help, but was subsequently killed by the post-accident fire, which consumed the entire vehicle.  (*Id.* at ¶ 53.)  The driver of the vehicle and another minor passenger were also killed in the accident.  (*Id.*)  Other than the time of the accident, 12:05 a.m., the circumstances of the accident are not alleged, except as described above.

It is alleged that at all relevant times, the minor was in the legal and physical custody of the Department, PFSF, and CPCI.  (*Id.* at ¶¶ 1, 106, 130, 178, 202, 226.) It is further alleged that Defendants made no effort to stop the minor from running away, to locate her, and to return her to a foster care placement or to her relatives, despite being informed of her whereabouts.  (*Id.* at ¶¶ 44, 50.)

According to Plaintiff, Defendants had certain duties and responsibilities, including the following:

> m.     To properly report, investigate and take action on incidents of children in the custody and care of Defendants PFSF and CPCI, including the [c]hild, eloping and running away from its physical custody and/or their placements;
>
> n.     To outline a plan of care to handle any special management issues identified in the history and assessments to ensure that all children in a foster home, including the [c]hild, are safe, appropriately cared for, and adequately supervised;
>
> o.     To implement reasonable safeguards to prevent children in care, including the [c]hild, from eloping and running away, to immediately report all children known to be missing, including the [c]hild, to law enforcement, the Court, and the Department, among others, and to take all reasonable and necessary steps and action to take such children back into physical custody and return them to a safe and secure shelter or placement[.]

(*Id.* at ¶¶ 3, 9, 15, 22, 29.)

Defendants also had a duty to comply with the requirements of the Department's Operating Procedure 155-10 (Services for Children with Mental Health and Any Co-Occurring Substance Abuse Treatment Needs in Out-of-Home Care Placements for Areas Not Included in the Medicaid Statewide Child Welfare Prepaid Mental Health Plan) and 175-85 (Prevention, Reporting, and Services to Missing

Children), and Florida Administrative Code Rule 65C-28.014 (Behavioral Health Services) and 65C-30.019 (Missing Children). (*Id.* at ¶¶ 4, 10, 16-17, 23-24, 30-31.) Defendants allegedly had a policy and/or custom of failing to comply with these Operating Procedures and Rules. (*Id.* at ¶¶ 5, 11, 18, 25, 32.)

It is alleged that at no time was the child evaluated for her mental health or substance abuse issues, provided treatment, or prescribed any medications. (*Id.* at ¶¶ 74-77.) Further, Defendants failed to provide her with a safe and appropriate placement designed to meet her mental and emotional needs or to adequately supervise her. (*Id.* at ¶ 6.) Instead, Defendants actively encouraged, assisted, and/or allowed her to run away from her foster care placement and/or Defendants' offices, which ultimately resulted in the child's death on April 18, 2008. (*Id.* at ¶¶ 6, 37, 51, 104, 125, 128, 149, 152, 173, 176, 197, 200, 221, 224.) Defendants' alleged failures to assess the child's needs, ensure appropriate treatment for her serious mental health needs, and place her in an appropriate, stable, safe, and therapeutic foster home, caused the child's mental health to rapidly deteriorate during her years in care. (*Id.* at ¶ 83.) Thus, Defendants were allegedly "deliberately indifferent to the [c]hild's medical, mental health, behavioral, psychological, and emotional needs." (*Id.* at ¶¶ 7, 12, 19, 26, 33, 56, 85, 99, 123, 147, 171, 195, 219.)

Plaintiff asserts that Defendants were aware of the dangers and risks of harm to foster children and this child in particular, when on runaway status and/or away from their placements. (*Id.* at ¶¶ 35, 103, 127, 151, 175, 199, 223.) Defendants

were also allegedly aware where the child was, where she could be found, and who she was associating with while on runaway status. (*Id.* at ¶¶ 39, 102, 126, 150, 174, 198, 222.) In addition, Defendants knew that the minor had recently run away from their offices in March of 2008, and that she had mental health issues. (*Id.* at ¶ 38.) Despite this knowledge, Defendants failed to prevent the minor from running away, to take her back into custody, to keep her in a safe placement, to notify the Florida Department of Law Enforcement's Missing Child Information Center system, to have a pickup order issued or otherwise diligently search for her, and to provide appropriate assessments. (*Id.* at ¶¶ 36, 39, 102, 126, 150, 174, 198, 222.)

With respect to her claims brought pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff alleges that Defendants, while acting under color of state law and by failing to assess and address the minor's mental health needs, were deliberately indifferent to her safety and welfare. (*Id.* at ¶¶ 88, 90, 96-97, 107, 112, 114, 120-23, 136, 138, 144-47, 160, 162, 168-71, 184, 186, 192-95, 208, 210, 216-19.) Further, Defendants knowingly and recklessly disregarded an excessive risk to her health and safety, which ultimately caused her death. (*Id.* at ¶¶ 91, 96, 115, 120, 139, 144, 163, 168, 187, 192, 211, 216.) As a direct and proximate result of Defendants' deliberate indifference, the child suffered, *inter alia*, serious physical injury, psychological trauma, pain and suffering, discomfort, deterioration, loss of the ability to enjoy life, pre-death pain and suffering, death, and other reasonably foreseeable compensatory damages. (*Id.* at ¶¶ 100, 108, 124, 132, 148, 156, 172, 180, 196,

204, 220, 228.)  Plaintiff claims that Defendants' "actions and failures to act were done with knowledge that said actions would deprive the [c]hild of her constitutional rights to be free from harm."  (*Id.* at ¶¶ 105, 129.)

As to her claims brought against Defendants, PFSF and CPCI, pursuant to the Florida Wrongful Death Act ("FWDA"), Sections 768.16-768.26 of the Florida Statutes, Plaintiff alleges that these Defendants took actions that culminated in the motor vehicle accident, causing the child's death.  (*Id.* at ¶¶ 234, 249.)  She alleges that these claims arise out of the "same operative facts" as her Section 1983 claims. (*Id.* at ¶¶ 230, 245.)

Finally, with respect to her negligence claim against all Defendants "for [d]amages [u]nrelated to [d]eath," Plaintiff alleges that the child died "after this cause of action arose in her favor . . . [and] would have been the plaintiff in this action if she had lived."  (*Id.* at ¶ 260.)  Plaintiff also alleges that this claim relates to actions taken by Defendants, "which resulted in injuries and damages to the [c]hild prior to the fatal motor vehicle accident."  (*Id.* at ¶ 262.)  She realleges many of the same or similar allegations to her Section 1983 claims.  (*Id.* at ¶¶ 260-75.)

## II.    Motion to Dismiss Standard

To survive a motion to dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  A claim is

plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* "[B]are assertions" that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 1951.

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Taylor v. Ledbetter*, 818 F.2d 791, 794 n.4 (11th Cir. 1987) (en banc).

III.    **Analysis**

A.    **Section 1983 Claims**

To state a claim under Section 1983, a plaintiff must allege: "1) that the

conduct complained of was committed by a person acting under color of state law; and 2) that the conduct deprived a person of rights secured by the Constitution or laws of the United States." *Morrison v. Washington Cnty.*, 700 F.2d 678, 682 (11th Cir. 1983) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1978)).   Collectively, Defendants argue that the Court should dismiss Plaintiff's Section 1983 claims for the following reasons: 1) failure to allege state action, 2) failure to allege a deprivation of rights secured by the Constitution or laws of the United States, 3) failure to allege an affirmative duty to protect Plaintiff from harm caused by third parties, 4) failure to allege causation, 5) failure to allege deliberate indifference, and 6) failure to allege sufficient grounds for vicarious liability.  This Court will address each argument in turn.

### 1.    State Action

First, Defendants assert that these claims fail as a matter of law because Plaintiff has failed to allege sufficient facts to establish state action.  (Docs. 27 & 32.) Thus, the threshold question is whether Defendants, all of whom are private parties, can be viewed as state actors acting under color of state law.

"Only in rare circumstances can a private party be viewed as a 'state actor' for [S]ection 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). "The Eleventh Circuit recognizes three tests for establishing state action by what is otherwise a private person or entity": the state compulsion test, the public function test, and the nexus/joint action test. *Id*.  Because Plaintiff does not contend that the

10

State coerced or significantly encouraged Defendants' actions (Doc. 43 at 6), the Court need not discuss the state compulsion test.

Under the public function test, state action is established "only when private actors are given powers (or perform functions) that are 'traditionally the exclusive prerogative of the State.'" *Harvey*, 949 F.2d at 1131 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)).  Plaintiff's Complaint alleges that at all relevant times, "pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida." (Doc. 24, ¶¶ 89, 113, 137, 161, 185, 209.)

Under the Florida Statutes, "the state has traditionally provided foster care services to children who have been the responsibility of the state."  Fla. Stat. § 409.1671(1)(f)1.  However, "[i]t is the intent of the Legislature that the Department of Children and Family Services shall outsource [contract with competent, community-based agencies] the provision of foster care and related services statewide."[4]  Fla. Stat. § 409.1671(1)(a).  "When a private nonprofit agency has received case management responsibilities, transferred from the state . . . , the agency may act as the child's guardian" for certain purposes. *Id.*  Moreover, "[i]f a child's parents' rights have been terminated, the nonprofit agency shall act as

---

[4] From an advisory legal opinion by the Florida Attorney General, it appears that a private entity stands in the place of the Department when it performs services for the Department pursuant to Section 409.1671(6) of the Florida Statutes, which services would normally be performed by the Department. *See* Fla. Attorney Gen. Opinion 2000-03 (Jan. 13, 2000).

guardian of the child in all circumstances." *Id.*

Further, "[t]he community-based agency must comply with statutory requirements and agency rules in the provision of contractual services" and "[e]ach community-based agency must be licensed as a child-caring or child-placing agency by the [D]epartment." Fla. Stat. § 409.1671(5)(a). Importantly, while the Department "may contract for the delivery, administration, or management of protective services, the services . . . relating to foster care, and other related services or programs," the Department "shall retain responsibility for the quality of contracted services and programs and shall ensure that services are delivered in accordance with applicable federal and state statutes and regulations." Fla. Stat. § 409.1671(2)(a).

Where, as here, the statutory scheme indicates that "it is the State which in effect provides the care through the private institutions," the public function test has been found satisfied. *See Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974); *Phillips* ex rel. *Green v. New York*, 453 F. Supp. 2d 690, 738 (S.D.N.Y. 2006) (finding that the actions of the private foster agency defendants were taken under color of state law as they would have been performed by the city had the agency not undertaken them and the agency was presumed to be an authorized agency under state law); *Harris v. Lehigh Cnty. Office of Children & Youth Servs.*, 418 F. Supp. 2d 643, 651 (E.D. Pa. 2005) (finding that foster care agencies that assist in the placement of foster children perform a function that has been traditionally the exclusive prerogative of the State regardless of whether the child is forcibly taken

12

from his home); *see also Keyes v. Huckleberry House*, 936 F.2d 578, at *1 (9th Cir.

1991) (stating that "a private child care institution might be found to be a state actor

if the child was in effect a ward of the state and the state was providing care through

the private agency"); *Barron v. Washington Cnty. Children & Youth Soc. Serv.

Agency*, 2006 WL 931678, at *4 (W.D. Pa. Apr. 11, 2006) (distinguishing between

foster care agencies and foster parents for purposes of finding state action under

Section 1983).[5]

Defendants cite case law finding that foster parents are not state actors, *see,

e.g.*, *Rayburn v. Hogue*, 241 F.3d 1341, 1348-49 (11th Cir. 2001), and that "[t]he

care of foster children is not traditionally the exclusive prerogative of the State,"

*Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir.

1989).  However, Defendants do not cite, and the Court has not found, any binding

case law holding that community-based agencies and their employees, such as

Defendants in this case, who contract with the State to provide placement and other

services for foster children, are not state actors for purposes of potential liability

---

[5] In the prison context, the Supreme Court has held that a physician, employed by
the state to provide medical services to state prison inmates, acts under color of state law
for purposes of Section 1983 because "[u]nder state law, the only medical care [the inmate]
could receive for his injury was that provided by the State," even though the physician was
employed pursuant to a contract that "did not require him to work exclusively for the prison."
*West v. Atkins*, 487 U.S. 42, 54-56 (1988); *see also Dolihite v. Maughon*, 74 F.3d 1027,
1044 (11th Cir. 1996) (finding that psychiatrists under a contract with the state were state
actors subject to liability under Section 1983 when they provided psychiatric services at a
state adolescent hospital); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th
Cir. 1985) (finding state action under the public function test where an entity contracted with
the county to provide medical care to persons housed at the county jail).

under Section 1983.[6]  The Court views placement services, traditionally exclusively performed by the State, as distinguishable from foster parenting services, not traditionally exclusively performed by the State.  Therefore, based on the above cited authorities, the Court finds that Plaintiff has adequately alleged state action under the public function test.

In light of this conclusion, the Court need not address the nexus/joint action test.   The Court notes, however, that Plaintiff's allegations in support of the nexus/joint action test are insufficient to satisfy that test.  "To charge a private party with [S]tate action under this standard, the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Rayburn*, 241 F.3d at 1348 (citations omitted).  "[T]he symbiotic relationship must involve the '*specific conduct of which the plaintiff complains*.'" *Id.* (citations omitted and emphasis added). Although Plaintiff alleges that "CPCI and/or PFSF were intertwined in a symbiotic relationship with the Department . . . based on the delegation of foster care and related services in Putnam County" (Doc. 24, ¶ 55), there are no allegations that the Department was involved in the specific conduct of which Plaintiff complains.  To the extent Plaintiff argues that the Department delegated its authority of performing child welfare services to Defendants, state action is not established on that basis as there is no indication that the Department delegated its power to Defendants "to take

---

[6] The Eleventh Circuit has stated that "state officials responsible for foster placement may be liable under section 1983."  *Taylor*, 818 F.2d at 796.

specific action" with respect to the child in this case.  *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 196 (1988).

## 2.    Deprivation of a Federal Right

Defendants argue that Plaintiff has failed to allege a deprivation of any right secured by the Constitution or laws of the United States.  The Court disagrees.

> It is clearly established in this circuit that foster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety.  The state's action in assuming the responsibility of finding and keeping the child in a safe environment places an obligation on state officials to ensure the continuing safety of that environment.  The failure to meet that obligation constitutes a deprivation of liberty under the fourteenth amendment.

*Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004) (citing *Taylor*, 818 F.2d at 794-95).

Plaintiff has alleged that the minor's liberty interest in physical safety was violated when Defendants essentially put her out on the street in a mental and emotional condition that would expose her to an unreasonable risk of harm.  Defendants argue there is no constitutional right to mental health treatment.  However, the Court need not address that issue in a vacuum.  Here, it is alleged that the minor's liberty interest in physical safety, a federal constitutional right, was violated in part by the failure to provide adequate mental health treatment, coupled with allowing and encouraging the child to run away.  Thus, deprivation of a liberty interest has been alleged.

### 3.      Affirmative Duty

Defendant, PFSF, argues that it did not owe an affirmative duty to keep the child free from harm at the time of her death because there was no special relationship between them, as Plaintiff has failed to allege that the child was involuntarily placed in Defendant's custody.  (Doc. 27 at 9-13.)  Again, the Court disagrees.

The Complaint contains a number of allegations that the minor had been involuntarily placed in Defendants' custody.  The Complaint alleges that the child was born cocaine positive in November of 1990, initially removed from her parents during the same month, and placed with relatives.  (Doc. 24, ¶¶ 57-58.)  It also alleges that the child was first adjudicated as a dependent child on or about December 11, 1990.  (*Id.* at ¶ 59.)  After a series of relative and non-relative placements, the child was placed in foster care on January 17, 2007, then again on February 7, 2007, and again on January 24, 2008.  (*Id.* at ¶¶ 67-71.)  These allegations are sufficient to indicate that the child had been involuntarily placed in Defendants' custody.

Moreover, although the Court need not decide this issue, the law in the Eleventh Circuit is unclear whether involuntary placement of a child in State custody is required in order to give rise to a duty to protect the child from physical harm.  In *Taylor*, the Eleventh Circuit reasoned that "a child *involuntarily* placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child

16

confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights."  818 F.2d at 797 (emphasis added).

However, following its decision in *Taylor*, the Eleventh Circuit stated:

> In a foster care situation, the state places the child, *whether voluntarily or not*, into the care of persons the state has chosen.  These foster families provide for the child's physical needs on behalf of the state.  The state exercises control and dominion over the child in a foster care situation and, accordingly, if a child is injured by a foster family, he or she has a section 1983 claim for a violation of a constitutional right.

*Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir. 1995) (emphasis added).  The court held that in cases where "the children remained in the physical custody of their parents who were free to take steps to protect them from harms perpetrated by other persons," the inquiry is "whether the county caseworkers controlled [the child's] life to such an extent that [his parents] could not reasonably be expected to protect him." *Id.* at 701; *see also D.W. v. Rogers*, 113 F.3d 1214, 1219 (11th Cir. 1997).  Moreover, in *Ray*, the Eleventh Circuit broadly stated that "assuming the responsibility of finding and keeping the child in a safe environment" imposes a duty toward the child.  370 F.3d at 1082.

There is, however, no square holding from the Eleventh Circuit on whether involuntary placement is required in a foster care context.  Other courts have not required involuntary placement in this context.  *See Nicini v. Morra*, 212 F.3d 798, 808-09 (3d Cir. 2000) (finding a special relationship existed where the child was in

17

the custody of, and substantially dependent upon, the Division of Youth and Family Services throughout the relevant period, even though the child "came to stay with the [family] on his own initiative"); *see also Harris*, 418 F. Supp. 2d at 651 (rejecting the argument that "because [plaintiff's amended complaint] does not aver that he was involuntarily removed from his home by the State, he does not plead the facts necessary to state a claim under Section 1983" and holding that "whether or not [plaintiff] was forcibly taken from his home, [defendant] acted under color of State law when it assisted [the county] in the placement of [plaintiff]").

### 4.    Causation

"For a section 1983 action to arise where an official is charged with failing to exercise an affirmative duty, two requirements must be satisfied." *Taylor*, 818 F.2d at 794. "First, the failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest. Second, the official having the responsibility to act must display deliberate indifference." *Id.* Defendants argue that there are insufficient allegations establishing causation under the *Taylor* "substantial factor" standard. (Docs. 32 & 47.) However, the Court finds sufficient allegations that the actions of Defendants, including allowing and encouraging the child to run away in her mentally and emotionally fragile state, were a substantial factor in her death.

Although the Complaint does not allege the circumstances of the accident, other than that it happened at 12:05 a.m. (Doc. 24, ¶ 52), a plausible claim has been

18

stated, and the specific circumstances of the accident can be developed at later stages of this case.  Thus, the Court rejects Defendant's argument that death as a result of an automobile accident was not foreseeable as a matter of law.

Plaintiff's Complaint alleges the child's death resulted from Defendants' failure to assess her mental and emotional needs, provide her with a safe and appropriate placement designed to meet these needs, adequately supervise her, provide her with shelter, and Defendants' active encouragement, assistance, and/or permission to run away from her foster care placement and/or Defendants' offices.  (*Id.* at ¶ 6; *see also id.* at ¶¶ 83, 91, 100, 108, 115, 124, 132, 139, 148, 156, 163, 172, 180, 187, 196, 204, 211, 220, 228.)  The fatal accident occurred within two weeks from the day the minor ran away.  (*Id.* at ¶¶ 49, 52.)  In light of these allegations and the fact that Section 1983 claims are no longer subject to a heightened pleading standard, the Court determines that Plaintiff has sufficiently pled causation and has given Defendants fair notice of what her claims are and the grounds on which they rest.[7] *See Randall v. Scott*, 610 F.3d 701, 705, 709 (11th Cir. 2010).

### 5.    Deliberate Indifference

Defendants also argue that Plaintiff fails to properly allege deliberate indifference to the risk of harm to the minor because she fails to provide factual

---

[7] Moreover, Defendants' assertion that there is no causal connection between Defendants' actions or omissions and the fatal car accident, ignores that Plaintiff has alleged connections between Defendants' actions or inactions and consequences and damages other than the child's death. (*See* Doc. 24, ¶¶ 100, 108, 124, 132, 148, 156, 172, 180, 196, 204, 220, 228.)

19

support for her conclusory allegations.  (Doc. 32 at 15.)  However, the underlying facts pled essentially are that Defendants placed an unstable minor on the street knowing that she was ill-equipped to care for herself and not caring what might become of her, while knowing of the many dangerous risks she faced on the streets with no support.  These factual allegations provide sufficient support for Plaintiff's allegations of deliberate indifference to the child's well-being.

Although the exact mechanism of harm may not have been predictable, the totality of risk to the minor was significant and allegedly deliberately ignored. Defendants argue that there are no allegations that "Defendants had *actual knowledge*, or *deliberately chose* not to learn, that the decedent would be involved in a high speed car chase between fighting non-party spouses."[8]  (*Id.* at 16-17 (emphasis in original).)  Defendant, PFSF, makes a similar argument.  (Doc. 47 at 7 ("The Plaintiff must allege . . . that PFSF had actual knowledge that the Decedent was at risk for becoming a victim in a motor vehicle collision . . . .").)  Defendants argue that unless liability is drawn that narrowly, they would be potentially liable for any harm that befalls a runaway on the streets.

Although the Court agrees that liability must be cut off at some point, that

---

[8] These additional facts are not alleged in the Complaint.  Therefore, they will not be considered because the Court is required to limit its consideration to the Complaint and any attachments thereto.  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997) (per curiam); *GSW, Inc. v. Long Cnty., Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993) (stating "the court limits its consideration to the pleadings and exhibits attached thereto").

determination cannot be made at the pleading stage of this case.  Neither party has cited a "runaway" case and this Court has not found one.  However, in the somewhat analogous case of *Camp v. Gregory*, the Seventh Circuit stated that whether a caseworker has a duty to protect a child "from [v]iolence [o]utside of the [h]ome" was "a more novel and difficult question."  67 F.3d 1286, 1296 (7th Cir. 1995).  Ultimately, the Court concluded that "it might be appropriate, depending upon the facts culminating in the injury, for the caseworker to be held liable for a deprivation of liberty."  *Id.* at 1297.  However, the Court cautioned that liability would "be confined to what we believe will be a very narrow range of cases."  *Id.*

The *Camp* court then outlined some of the pertinent criteria to impose liability. It noted that the complaint did not detail the particular circumstances of the child's death.  However, development of the facts was not necessary in *Camp* because the court held that the caseworker was entitled to qualified immunity.[9]  *Id*. at 1298.  The *Camp* court did say, however, that both the "circumstances of [the child's] death" and "the particular injury" must be reasonably foreseeable.  *Id.* at 1297.  The court concluded that the complaint stated a Section 1983 claim because "we can hypothesize facts consistent with these allegations which, if proven, would make out a valid due process claim against [the caseworker]."  *Id.* at 1298.[10]

---

[9] None of the Defendants has raised the defense of qualified immunity.

[10] The Court recognizes that *Camp* was decided prior to the Supreme Court's decision in *Iqbal*, which sets forth the plausibility standard that this Court applies in ruling

(continued...)

This Court agrees with much of the reasoning of the Seventh Circuit in *Camp*. Although liability may be narrow, Plaintiff has alleged that "death" to the runaway minor was a danger that Defendants were aware of and disregarded. (Doc. 24, ¶ 35.) This Court believes the Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949. To take Defendants' argument to its logical conclusion would mean that liability would never attach in a runaway situation, no matter the age of the child and no matter how egregious the circumstances, if the defendants did not predict the exact mechanism of injury or death. Rather than accept this argument, the Court believes further factual development is warranted. *See Omar v. Lindsey*, 334 F.3d 1246, 1247-49 (11th Cir. 2003) (affirming the district court's denial of a motion to dismiss and its rejection of defendants' argument that in a qualified immunity context, defendants had to be on notice that it was constitutionally wrongful to allow a foster mother specifically to, *inter alia*, whip and starve a child, rather than bludgeon the child as in *Taylor*, 818 F.2d at 792).

Moreover, the Complaint's allegations distinguish this case from the Eleventh Circuit's decision in *Ray*, 370 F.3d 1079. In *Ray*, the court found that plaintiffs' allegations that "defendants failed to take various actions . . . do not show that the defendants had actual knowledge of a substantial risk of harm to [the child]." *Id.* at

---

[10](...continued)
on Defendants' Motions to Dismiss.

1084.  The court stated: "[a]t most, [plaintiffs'] claim is that the defendants were negligent or careless in not gathering the information, or that they negligently or carelessly failed to follow Department guidelines."  *Id.*  In contrast, here, Plaintiff has sufficiently pled that Defendants were deliberately indifferent to known risks.  The allegations go beyond mere negligence.

In their memoranda, Defendants rely heavily on *Cohen v. Dist. of Columbia*, 2010 WL 3937528 (D.D.C. Oct. 8, 2010).  However, the Court considers that case also distinguishable.  In that case, a foster child and ward of the District of Columbia ("the District") was killed when he exited a van and stepped into oncoming traffic while being transported by a contractor.  The Court held that the child was in the District's custody and, therefore, the District owed him "a constitutional duty of care." *Id.* at *7.  However, the court held there was no deliberate indifference to the minor's constitutional rights.  *Id.*

Other than involving a motor vehicle accident, the facts of *Cohen* bear little resemblance to this case.  At most, the facts in *Cohen* made out a potential negligence claim.  In *Cohen*, the court concluded that "[n]o reasonable juror could find that the District or [the contractor that provided placement and counseling] knew or should have known of a substantial risk to [the child's] safety because the van parked on the street instead of in the lot or because there was no attendant accompanying the driver." *Id.* at *10.  In the case at bar, the allegations of the Complaint are sufficient to allege that Defendants knew of and were deliberately

23

indifferent to a substantial risk to the minor's safety when they allowed and encouraged her to run away.

### 6.    Vicarious Liability

Defendants argue that PFSF and CPCI cannot be held vicariously liable for the conduct of their employees because there are insufficient allegations that the alleged conduct was done pursuant to these entities' corporate policy or custom. (Docs. 32 & 47.)

Local governing bodies "can be sued directly under [Section] 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[11] *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).  Moreover, they "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."[12]  *Id.* at 690-91.  The same principles apply to corporate entities.  *Harvey*, 949 F.2d at 1129-30.

---

[11] "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997).

[12] "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Brown*, 520 U.S. at 404.

Plaintiff alleges that "Defendants CPCI and/or PFSF and/or some of their supervisors and/or employees had a policy and/or custom of failing to comply with the requirements of the [Department's] Operating Procedures, including, but not necessarily limited to" 155-10 and 175-85, and the Florida Administrative Code Rule 65C-30.019. (Doc. 24, ¶¶ 5, 11, 18, 25, 32.) Plaintiff also alleges that Defendants had a duty to comply with the requirements of these Rules and Operating Procedures. (*Id.* at ¶¶ 4, 16.) Plaintiff further alleges that "CPCI and/or PFSF did not address the mental health needs of many children in State care and lacked appropriate placements to address such mental health needs." (*Id.* at ¶ 84.)

Essentially, Plaintiff alleges that CPCI and/or PFSF had a policy or custom of not reporting runaways to any proper authorities or concerned parties, not attempting to locate runaways, not seeking assistance in locating runaways, not documenting efforts to find runaways, not interviewing or evaluating runaways when located to assess their needs, and not developing plans to control runaways. (*Id.* at ¶¶ 4-5.) Thus, Plaintiff has alleged more than mere negligence and has sufficiently alleged a policy or custom which was a moving force behind the constitutional deprivation. *Cf. Rey v. Kmart Corp.*, 1998 WL 656070, at *4-5 (S.D. Fla. July 21, 1998) (finding "plaintiff's allegation of negligence is insufficient to support a finding that [the officers] acted in accordance with defendants' unconstitutional policy" where "plaintiffs have not pled the existence of a specific store custom or policy which could qualify as the moving force behind the defendant's alleged constitutional deprivations").

B.    **Wrongful Death Claims**

Plaintiff brings two counts under the FWDA.  (Doc. 24, ¶¶ 230-59.)  Count VII is brought against Defendant, PFSF, and Count VIII is brought against Defendant, CPCI.  (*Id.*)  Only Defendant, PFSF, argues that the FWDA claims should be dismissed on the basis that Plaintiff's claims for damages for the deceased minor's pain and suffering, mental anguish, loss of capacity for life, and similar remedies that are available only prior to the minor's death, are impermissible prayers for relief pursuant to Section 768.21 of the Florida Statutes.  (Doc. 27 at 19-20.)

Even assuming some of the allegations of this count are immaterial because they go beyond the remedies provided by the FWDA, the Court does not find that a dismissal is required.  The claims for damages that Defendant finds objectionable are not the only claims that Plaintiff asserts in Counts VII and VIII.  Moreover, the prayer for relief asks for all "recoverable" and "lawful" damages.  (Doc. 24 at 63.) Even assuming that Plaintiff's FWDA claims contain impermissible prayers for relief, the appropriate remedy would be a motion to strike any such claims pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, not a dismissal.  *See, e.g.*, *DHL Express (USA), Inc. v. Express Save Indus., Inc.*, 2009 WL 3242012, at *1 (S.D. Fla. Oct. 6, 2009); *Natarajan v. Paul Revere Life Ins. Co.*, 2009 WL 1117405, at *2 (M.D. Fla. Apr. 24, 2009); *see also Williams v. Bay Hosp., Inc.*, 471 So.2d 626, 630 (Fla. Dist. Ct. App. 1985).  Therefore, PFSF's Motion to Dismiss should be denied on this basis.

### C.     Negligence Claim

The final count of Plaintiff's Complaint, Count IX, is for negligence against all Defendants.  (Doc. 24 at 63.)  Defendants argue that Plaintiff's claim for negligence abated at the time of the minor's death and was subsumed by the FWDA claims. (Docs. 27 & 32.)  Plaintiff responds that she is entitled to plead in the alternative and to bring a claim for damages that the child suffered during her lifetime as a result of Defendants' negligence that did not cause the child's death.  (Doc. 43 at 42.)  The Court agrees with Plaintiff.

Plaintiff alleges this claim is "for [d]amages [u]nrelated to [d]eath."  (Doc. 24 at 63.)  Moreover, Plaintiff alleges that the child died "*after* this cause of action arose in her favor . . . [and the child] would have been the plaintiff in this action if she had lived."  (*Id.* at ¶ 260 (emphasis added).)  Plaintiff also alleges that this claim relates to actions taken by Defendants, "which resulted in injuries and damages to the [c]hild *prior to* the fatal motor vehicle accident."  (*Id.* at ¶ 262 (emphasis added).)  Although it may be unclear exactly what quantifiable damages Plaintiff may have suffered prior to the accident itself, this is not a basis for dismissal.

Count IX is not based on allegations that the injuries to the child resulted in her death and there has not been determination to that effect yet.   *See Salfi v. Columbia/JFK Med. Ctr. Ltd. P'ship*, 942 So.2d 417, 420 (Fla. Dist. Ct. App. 2006) (citing *Niemi v. Brown & Williamson Tobacco Corp.*, 862 So.2d 31, 33 (Fla. Dist. Ct. App. 2003), for the conclusion that "a personal injury action only 'abates' if it is first

27

determined that the personal injury resulted in the plaintiff's death"). Moreover, "[w]hen this issue is unresolved, the law permits a plaintiff to allege alternative theories." *Niemi*, 862 So.2d at 34 (also stating that "[u]nless the parties agree upon a cause of death, it is possible that the co-personal representatives will be required to plead both a personal injury action and an alternative wrongful death action"); *see also Smith v. Lusk*, 356 So.2d 1309, 1311 (Fla. Dist. Ct. App. 1978). Therefore, Plaintiff states a claim in Count IX.

**RECOMMENDATION**

Accordingly, it is respectfully **RECOMMENDED** that:

1.      The Motions to Dismiss (**Docs. 27 & 32**) be **DENIED**.

2.      Defendants be required to answer Plaintiff's First Amended Complaint within **fourteen (14) days** after entry of the Court's order denying Defendants' Motions to Dismiss.

**DONE AND ENTERED** at Jacksonville, Florida, on January 24, 2011.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record